**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LYNN SHADE,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:14-CV-813** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **ALFA LAVAL INC.,** | : | |
| **Defendant** | : | |

**MEMORANDUM**

Before the Court is Defendant Alfa Laval, Inc.'s motion for summary judgment.  (Doc.

No. 23.)  For the reasons that follow, the Court will grant the motion.

**I.    BACKGROUND**

Plaintiff Lynn Shade ("Shade"), who was born on November 2, 1953, began working at

Defendant Alfa Laval, Inc.'s ("Alfa Laval") Lykens facility in 1989.[1]  (Doc. No. 24 ¶¶ 2, 4.)  Alfa

Laval manufactures, sells, and services a variety of equipment, including separators, heat

exchangers, and pump and valve assembly devices in the United States and abroad.  (Id. ¶ 1.)

Shade began his employment with Alfa Laval as a laborer, a position that was part of the

bargaining unit represented by a union and covered by a collective bargaining agreement

between Alfa Laval and the union.  (Id. ¶ 5.)  During his employment with Alfa Laval, Shade

held a variety of bargaining unit positions, including stud operator and welder.  (Id. ¶ 6.)

On September 1, 2003, Shade was promoted to the position of maintenance technician,

---

[1] The following relevant facts of record, taken mostly from Defendant's statement of material facts (Doc. No. 24), are undisputed unless otherwise noted.  Defendant's statement of material facts contains specific citations to the record at each numbered paragraph.  The Court also incorporates facts set forth in Shade's response to Defendant's statement of material facts (Doc. No. 30), as well as other documents of record, where appropriate.

which was not a bargaining unit position. (Id. ¶¶ 7-8.) Shade acknowledges that he became an at-will employee as soon as he started working as a maintenance technician, meaning that the Company could terminate his employment at any time. (Id. ¶ 8.) As a maintenance technician, Shade's duties included, among other things, making sure equipment was maintained in running order, coordinating and performing preventative maintenance, fixing equipment when it was broken, maintaining safety equipment, updating equipment manuals and taking inventory of spare parts and maintenance supplies, and helping with building and grounds work as needed. (Id. ¶ 9.)

When Shade began his employment as a maintenance technician, he worked alongside a second maintenance technician named Michael Forsman ("Forsman"). (Id. ¶ 11.) Forsman left Alfa Laval sometime around 2009, and was replaced by Jim Ulsamer ("Ulsamer"). (Id. ¶ 13.) Throughout his employment as a maintenance technician, Shade's supervisor was the production manager at the Lykens facility. (Id. ¶ 14.) Shade's first supervisor was George Klemick ("Klemick"), a production manager who was later replaced by Jim Ritzman ("Ritzman"). (Id. ¶¶ 15-16.) Ritzman's manager was the factory manager, Wayne Heyer. (Id. ¶ 17.) Heyer held that position during most of the time that Ritzman supervised Shade. (Id.)

All non-bargaining unit employees at Alfa Laval receive annual performance appraisals. (Id. ¶ 18.) Written performance appraisals are completed by each employee's direct supervisor. (Id.) Prior to 2009, employees were assessed and rated on various behaviors related to the categories of action, courage, teamwork, profit, and leadership. (Id. ¶ 21.) For each behavior, an employee was rated as "highly developed," "sufficiently developed," or "needs development." (Id.) From 2009 on, the written performance appraisal asked supervisors to rate their employees

on a scale of one to five in five distinct categories under the heading "Work Practices and Performance Competencies."  Those categories include:  "Teamwork," "Concern for Excellence (Quality)," "General Abilities (Job Knowledge)," "Time Utilization (Productivity)," and "Safety." (Id. ¶ 22; Doc. No. 24-3, Exhibit 11 to Shade Dep. at 1.)

Both before and after 2009, the annual performance appraisal provide a space for supervisors to make specific comments that corresponded to their various ratings.  (Doc. No. 24 ¶ 23.)  Both the pre and post 2009 annual performance appraisals also include a rating system, which required a supervisor to give an employee an "Overall Evaluation."  (Doc. No. 24-3, Exhibit 9 to Shade Dep. at 3; Exhibit 11 to Shade Dep. at 2.)  As part of the "Overall Evaluation" included in both versions of the performance appraisals, supervisors indicate whether an employee "Exceeds Expectations," "Meets Expectations," or "Does not fully meet Expectations."  (Id.)

After an employee's supervisor finished a performance appraisal, the supervisor would confer with his or her manager to get his or her feedback on the performance appraisal before meeting with the employee to discuss the evaluation.  (Doc. No. 24 ¶ 26.)  At these meetings, employees were given the opportunity to provide comments regarding the appraisal, which were noted on the appraisal itself, and then were asked to sign the appraisal.  (Id.)[2]  The purpose of the annual performance appraisal is to provide feedback to employees about their performance on a regular basis.  (Id. ¶ 27.)  Alfa Laval also has a corrective action policy in place, the purpose of which it maintains is "to provide feedback to the employee so that they know if they're meeting

---

[2] Shade disputes that the protocol described in this paragraph was consistently followed throughout his employment, and specifically states that he was not afforded the opportunity to make comments on his 2012 appraisal.  (Doc. No. 30 ¶ 26.)

3

expectations or not."  (Id. ¶¶ 27-28.)[3]  However, Alfa Laval managers are not required to take

corrective action if an employee's behavior deviates from company standards.  (Id. ¶ 28.)

      In February of 2008, Shade met with Ritzman to discuss his 2008 performance appraisal.

(Id. ¶ 30.)  Shade was 54 years old at the time of this meeting.  (Id.)  This was the first appraisal

Ritzman completed as Shade's supervisor.  (Id.)  In the five categories assessed in the appraisal –

action, courage, teamwork, profit, and leadership – Shade was rated as "sufficiently developed"

in all behaviors relevant to the categories of "action" and "courage."  (Doc No. 24-3, Exhibit 9 to

Shade Dep. at 2.)[4]

      With respect to the category of "teamwork," Shade was rated as "needs development"

with regard to two behaviors: "organizational astuteness" and "communication skills."  (Id.)  In

the comments section of the appraisal, Ritzman noted as to "organizational awareness" that

"Lynn needs to become acustomed [sic] to, and comply with new internal organizational

changes/policies."  (Id. at 3.)  As to "communication skills," Ritzman wrote that "Lynn needs to

improve his written, and electronic communication skills.  He should use email, and internal

calendar for vacation scheduling."  (Id.)

      With respect to the remaining categories of "profit" and "leadership," Shade was rated as

"needs development" in the "profit" behavior of "commercial orientation," and in the

"leadership" behavior of "integrity."  (Id. at 2.)  Ritzman gave Shade an "Overall Evaluation" of

---

[3] Shade disputes Defendant's statement regarding the purpose of the corrective action policy, maintaining that Ritzman testified that the purpose of the corrective action policy was to take action when an employee's conduct fell below acceptable standards.  (Doc. No. 30 ¶ 27.)

[4] Shade was rated "highly developed" in the behavior of "drive/tenacity" related to the "courage" category.  (Id.)

"Meets Expectations."  (Id. at 3.)  Shade acknowledges that the notes on his 2008 performance appraisal reflect Ritzman's assessment of his performance as of February 2008.  (Doc. No. 24 ¶ 33.)

In February of 2009, Shade met with Ritzman and factory manager Heyer to discuss his 2009 performance appraisal.  (Id. ¶ 34.)  Shade was 55 years old at the time of this meeting.  (Id.)  At this time, the new form of performance appraisal was utilized, wherein five categories of "Work Practices and Performance Competencies" were assessed on a scale of one to five.  (Doc. No. 24-3, Exhibit 11 to Shade Dep. at 1.)  They included "Teamwork," "Concern for Excellence (Quality)," "General Abilities (Job Knowledge)," "Time Utilization (Productivity)," and "Safety."  (Id.)  As to the category of "Teamwork," Shade received a rating of 3 out of 5 and the following comments: "Lynn did exhibit commitment and flexibility during the 2008 North Strip Rack refurbishment project working long hours and weekends to get the equipment into working condition and on line.  There is the opportunity for Lynn to improve his teamwork and working relations with other Lykens employees."  (Id.)

With regard to the category of "Concern for Excellence (Quality)," Shade also received a rating of 3 out of 5 with the comment that "[i]nstallation and maintenance jobs are typically done well, but tend to take longer then [sic] Lynn initially estimates."  (Id.)  Shade similarly received a rating of 3 out of 5 in the category of "General Abilities (Job Knowledge)," with the following comments: "Lynn is [sic] knows machine, equipment and building repairs.  Areas for growth include PLC trouble shooting, hydraulic systems and electrical controls."  (Id.)

As to the category of "Time Utilization (Productivity)," Shade received a rating of 2 out of 5, with the comment that "Lynn needs to learn when it is time to call in the experts.  To [sic]

5

much production time has been lost trying to troubleshoot or repair systems that require a trained specialist or unique equipment." (Id.)  Finally, in the category of "Safety," Shade received a rating of 3 out of 5, with the comment that "[s]afety is acceptable.  Housekeeping in and around the maintenance area needs to improve significantly." (Id.)

Under the listing of the five categories of "Work Practices and Performance Competencies," there is an "Overall Rating" category similarly assessed on a scale of one to five. (Id.)  Ritzman gave Shade an "Overall Rating" of 3 out of 5 in this category. (Id.)  Further, Shade received an "Overall Evaluation" of "Meets Expectations." (Id. at 2.)  Shade acknowledges that the notes on the appraisal reflected Ritzman and Heyer's assessment of Shade's performance as of February 2009.  (Doc. No. 24 ¶ 38.)

In 2009, Alfa Laval was contemplating a company-wide reduction in force.  (Id. ¶ 39.)  Around the same time the company assessed the skills of the two maintenance technicians, Shade and Ulsamer.  (Id. ¶ 40.)  Ritzman was responsible for evaluating Shade and Ulsamer's skills, and rated each maintenance technician in ten categories fundamental to their job duties, preparing a matrix displaying his ratings.  (Id. ¶ 41.)  Ritzman gave Shade a below-average rating in six out of the ten categories, including a rating of "very weak" in three categories.  (Id. ¶ 42.)  Ulsamer received above-average ratings in seven of the ten categories, and was rated below average in only one category.  (Id.)  Ritzman shared this rating matrix with Amy Hartley ("Hartley'), Vice President of Human Resources, and Heyer, and the group discussed whether it was necessary to reduce the number of maintenance technicians as part of the Company's reduction in force.  (Id. ¶ 43.)  Hartley, Heyer, and Ritzman decided not to eliminate either of the

maintenance technicians.  (Id. ¶ 44.)[5]

In February of 2010, Shade met with Ritzman to discuss his 2010 performance appraisal. (Id. ¶ 46.)  Shade was 56 years old at the time of the meeting.  (Id.)  In this appraisal, Shade received a rating of 3 out of 5 on three of the five categories of "Work Practices and Performance Competencies": "Teamwork," "General Abilities (Job Knowledge)," and "Time Utilization (Productivity)." (Doc. No. 24-3, Exhibit 16 to Shade Dep. at 1.)  As to "Teamwork," Ritzman commented that "Lynn cooperates with company needs to keep equipment running in order to meet production needs."  (Id.)  As to "Safety" it was noted that "Lynn follows safety procedures on all activities."  (Id.)  Ritzman's comments on "General Abilities (Job Knowledge)" were as follows: "Lynn has good knowledge of the facility and equipment.  Look for ways to improve what we have instead of fixing to old standards.  Use purchase requisition forms at all times."  (Id.)

In two of the five categories of "Work Practices and Performance Competencies" – "Concern for Excellence (Quality)" and "Time Utilization (Productivity)" – Shade received a rating of 2.5 out of 5.  As to "Concern for Excellence (Quality)," Ritzman commented that "[o]verall quality is generally good.  Lynn needs to increase standards to get equipment and facility back to like-new condition.  Purge out old parts, and organize spares in accordance with 5S standards."  (Id.)  With regard to "Time Utilization (Productivity)," Ritzman commented that "Lynn is very punctual, and has very good attendance.  Lynn's assignments from the weekly maintenance list tend to take longer than expected.  Keep pushing weekly assignments.  Lynn

---

[5] Shade notes that he received a merit-based raise after the skills assessment.  (Doc. No. 30 ¶¶ 42, 44; Doc. No. 31-12, Exhibit 17 to Hartley Dep.)

tends to not stay focused on weekly assigned tasks.  Conversations with employees and guests should be kept to a minimum so we stay on track with assignments."  (Id.)

Under the listing of the five categories of "Work Practices and Performance Competencies," Shade was given an "Overall Rating" of 3 out of 5.  (Id.)  Further, he received an "Overall Evaluation" of "Meets Expectations."  (Id. at 2.)  Shade acknowledges that the notes on the performance appraisal reflected Ritzman's assessment of Shade's performance as of February 2010.  (Doc. No. 24 ¶ 50.)

In April of 2010, Shade received a verbal warning for an incident at work between Shade and Ulsamer, which was documented in an April 15, 2010 email from Ritzman to Shade, attached as Exhibit 17 to Shade's Deposition.  (Id. ¶¶ 51-53; Doc. No. 24-3, Exhibit 17 to Shade Dep.)  The substance of the email is as follows:

> This email is to document and recap our conversation regarding my expectations for you in your role in the maintenance team.  I expect you to handle the projects that are assigned to you and for Jim to work on his own projects and assignments. You are not to "take over" his work.  That being said, Jim may have questions and you need to help with the answers, but then allow him to proceed with the project. I understand that you believe Jim does not know mechanical details and does not look at things closely enough.  I assign work to the members on the team based on their individual skill sets.  Remember that it is my responsibility to assess the performance of the maintenance team members, and I will handle accordingly.
>
> We also discussed that you can not be rude or disrespectful to others, including Jim.  We have a professional work environment and the expectation is that everyone is treated with respect.  You indicated that this is something you are aware you need to work on.  After our meeting I was made aware that you had been in the shop talking negatively about Jim and using profane language in describing Jim.  This is unacceptable and should not occur again.
>
> Lynn - I need you to know that I and Alfa Laval take this matter seriously and this document will become a part of your personnel file.  Let me know if you would like to discuss this issue further.

(Doc. No. 24-3, Exhibit 17 to Shade Dep. at 1.)  Shade disputes that the email accurately

summarizes the events that took place.  (Doc. No. 30 ¶ 55.)  Shade also points out that this was

his first incident of discipline in over 20 years of service with Alfa Laval.  (Id. ¶ 56.)

       In February of 2011, Shade met with Ritzman to discuss his 2011 performance appraisal.

(Doc. No. 24 ¶ 57.)  Shade was 57 years old at the time.  (Id.)  In this appraisal, Ritzman gave

Shade a 3 out of 5 in the three "Work Practices and Performance Competencies" categories of

"Teamwork," "Time Utilization (Productivity)," and "Safety."  (Doc. No. 24-3, Exhibit 18 to

Shade Dep. at 1.)  As to "Teamwork," Ritzman commented that "Lynn typically works with

others to accomplish task."  (Id.)  With regard to "Time Utilization (Productivity)," Ritzman

commented that "Lynn has good attendance and is never late.  We need better planning on

vacation planning.  Lynn can't call in mid December and say he won't be in the rest of the year

to use his remaining vacation.  Our facility can't run without maintenance present."  (Id.)  On

"Safety" Ritzman commented that "Lynn complies with most safety policies.  Just remember to

use harness when on a lift."  (Id.)

       As to the "Work Practices and Performance Competencies" categories of "Concern for

Excellence (Quality)," and "General Abilities (Job Knowledge)," Ritzman gave Shade a rating of

2 out of 5.  He commented as follows on his 2 rating in the category of "Concern for Excellence

(Quality)": "I would like to see a stronger effort to repair equipment to better quality rather than

enough to get by.  We need a stronger push for 5S.  Organize tools and equipment so we don't

have to borrow tools from production cells."  (Id.)  As to "General Abilities (Job Knowledge),"

Ritzman commented that "Lynn has good knowledge of facility, and older equipment.  Lynn is a

little weak in complicated electrical issues and PLC.  When taking equipment apart he has

forgotten to mark wires for reassembly."  (Id.)

Ritzman gave Shade an "Overall Rating" for "Work Practices and Performance Competencies" of 3 out of 5.  (<u>Id.</u>)  In connection with Shade's 2011 performance appraisal, and as an "Overall Evaluation," Ritzman rated Shade as "not fully meet[ing] expectations."  (<u>Id.</u> at 2.)  He articulated that, in his opinion, Shade had not improved for years.  (Doc. No. 30 ¶ 61.) Shade acknowledges that Ritzman's appraisal reflected his assessment of Shade's performance as of February 2011. (Doc. No. 24 ¶ 62.)

In July of 2011, Shade was involved in another incident at work, for which he received a written warning.  (<u>Id.</u> ¶¶ 63-66.)  The parties dispute the specifics of the incident, but agree that it resulted in the issuance of a written warning.  (Doc. No. 30 ¶¶ 63-66.)  The written warning, dated July 14, 2011, and signed by Shade and factory manager Heyer, provided as follows:

> This memo is to address the nature of your behavior the morning of Wednesday, July 13 at approximately 8:30 AM.
>
> You entered my office and expressed your dislike with the job assignment of Jim Ulsamer and proceeded to elevate your verbal dissatisfaction with job assignments to point [sic] of loudly asking me to fire you.  The entire conversation was unnecessary, first if you would have asked why Jim was on his assignment and second, accepted the fact that you are not the maintenance manager or supervisor and do not direct Jim Ulsamer's work assignments.
>
> The nature of your communication regarding Jim's assignment was unreasonable, improper and bordering on insubordination.  If you wish to have Jim Ulsamer's assistance on a job, you need to confirm it with Jim Ritzman or his backup.  Jim was working on completing a job to meet a testing deadline for a health and safety issue in the blast booth.
>
> It is necessary to once again advise you that you are not Jim Ulsamer's supervisor and are not to make or change his work assignments.  Jim Ritzman supervises you and Jim Ulsamer and in his absence I am covering the duty.
>
> Any further behavior of this type will result in further disciplinary action up to including termination.

(Doc. No. 24-3, Exhibit 19 to Shade Dep. at 1.)  Plaintiff points out that this was his first and

only written warning in over 20 years of service to Alfa Laval.  (Doc. No. 30 ¶ 64.)

In November of 2011, two of the cylinders (hydraulic pistons used in the production of spiral heat exchangers) at Alfa Laval's Lykens' facility broke.  (Doc. No. 24 ¶ 67.)  At the time the cylinders broke, there were no spare cylinders or cylinder repair kits at the facility.  (Id. ¶ 68.)  The parties dispute whether it was Shade's responsibility to ensure that appropriate spare parts and repair kits were at the Lykens facility in case any piece of machinery broke.  (Compare Doc. No. 24 ¶ 69 with Doc. No. 30 ¶ 69.) Shade points out that he never received any type of discipline relative to this incident. (Doc. No. 30 ¶ 70.)

Also in November of 2011, a blast cart at the Lykens facility needed to be repaired. (Doc. No. 24 ¶ 72.)  The parties dispute whether Shade appropriately repaired the blast cart. (Compare Doc. No. 24 ¶¶ 73-74 with Doc. No. 30 ¶¶ 73-74.)  Shade points out that he never received any type of discipline as a result of this event.  (Doc. No. 30 ¶ 73.)  The parties further dispute the specifics of Shade's involvement in an incident involving an air compressor in February of 2012.  (Compare Doc. No. 24 ¶¶75-77 with Doc. No. 30 ¶¶ 75-77.)  Shade points out that he never received any type of discipline as a result of this event.  (Doc. No. 30 ¶¶ 75, 77.)

On Shade's 2012 performance appraisal, Ritzman gave Shade an "Overall Evaluation" of "not fully meet[ing] expectations."  (Doc. No. 24 ¶ 78; Doc. No. 24-3, Exhibit 22 to Shade Dep. at 2.)  When an Alfa Laval employee receives an overall rating of "not fully meet[ing] expectations," the supervisor must first consult with the Human Resources Department before finalizing the appraisal and holding the employee's annual performance appraisal meeting. (Doc. No. 24 ¶ 79.)  Ritzman had followed this step the previous year.  (Id.)  Because he planned to again give Shade an overall rating of "not fully meet[ing] expectations" for 2012, Ritzman

sent Shade's 2012 performance appraisal to Hartley to review.  (Id. ¶ 80.)  The parties dispute

whether the receipt of an "Overall Evaluation" of "not fully meeting expectations" for two years

in a row justified termination under Company policy.  (Compare Doc. No. 24 ¶¶ 81-82 with Doc.

No. 30 ¶¶ 81-82.)

Hartley suggested the possibility of terminating Shade.  (Doc. No. 24 ¶ 82; Doc. No. 31-

2, Exhibit B to Plaintiff's Brief in Opposition at 40.)  On or about February 21, 2012, Hartley,

Heyer, and Ritzman decided to terminate Shade's employment.  (Doc. No. 24 ¶ 83; Doc. No. 31-

2, Exhibit B to Plaintiff's Brief in Opposition at 43-44.)  On or about March 8, 2012, Ritzman

and Hartley met with Shade to inform him that his employment was being terminated.  (Id. ¶ 86.)

The parties dispute the basis for and appropriateness of Shade's termination.  (Compare Doc. No.

24 ¶¶ 82-84 with Doc. No. 30 ¶¶ 82-84.)

In August of 2015, Ritzman was 52 years old, Hartley was 46 years old, and Heyer was

63 years old. (Doc. No. 24 ¶ 85.)  Accordingly, in February of 2012, Ritzman was approximately

49 years old, Hartley was approximately 43 years old, and Heyer was approximately 60 years

old.  (Id.)

It is Alfa Laval practice not to offer severance pay to non-bargaining unit employees who

have been terminated for cause.  (Id. ¶ 88.)  In 2012, an employee named Kim Rebuck was

terminated from employment at Alfa Laval's Lykens' facility due to a job elimination, not

because of unsatisfactory performance.  (Id. ¶ 91.)  Because she was terminated due to a job

elimination, and not for cause, Ms. Rebuck was offered five (5) weeks of severance pay based on

her years of service, consistent with Alfa Laval practice.  (Id. ¶ 91.)

Following his termination, Shade filed a complaint with the Pennsylvania Human

12

Relations Commission ("PHRC") and the Equal Employment Opportunity Commission

("EEOC"), alleging age discrimination.  (Id. ¶ 94.)  Shade later amended this complaint. (Id.)

Shade appropriately exhausted his administrative remedies before the PHRC and EEOC, both of

which issued right to sue letters.  (Doc. No. 1 ¶¶ 40-43.)  On April 28, 2014, Shade filed his

complaint in this matter, asserting claims pursuant to the Age Discrimination and Employment

Act ("ADEA"), 29 U.S.C. § 621, et seq., and the Pennsylvania Human Relations Act ("PHRA"),

43 P.S. § 955 et seq.  (Doc. No. 1.)  Discovery ended in July 2015, and Defendant Alfa Laval

subsequently filed this motion for summary judgment with accompanying statement of

undisputed material facts and a brief in support.  (Doc. Nos. 23-25.)  On October 5, 2015,

Plaintiff filed his brief in opposition and answer to statement of facts.  (Doc. Nos. 30, 31.)

Defendant Alfa Laval filed its reply brief on October 28, 2015.  (Doc. No. 36.)  Accordingly,

Defendant's motion for summary judgment is fully briefed and ripe for disposition.

## II.    LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is

warranted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is

material if it might affect the outcome of the suit under the applicable law, and it is genuine only

if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a

verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49

(1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient

disagreement to require submission to the jury or whether it is so one-sided that one party must

prevail as a matter of law.  Id. at 251-52.  In making this determination, the Court must "consider

all evidence in the light most favorable to the party opposing the motion." <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." <u>Berckeley Inv. Grp. Ltd. v. Colkitt</u>, 455 F.3d 195, 201 (3d CI. 2006); <u>accord</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. <u>Celotex</u>, 477 U.S. at 322. With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative. <u>Anderson</u>, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. <u>Id.</u> at 252; <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Further, a party may not defeat a motion for summary judgment with evidence that would not be admissable at trial. <u>Pamintuan v. Nanticoke Mem'l Hosp.</u>, 192 F.3d 378, 387 (3d Cir. 1999).

## III.    DISCUSSION

Defendant moves for summary judgment on Shade's claims pursuant to the ADEA and the PHRA.  Both claims are based on Shade's contention that he was wrongfully terminated because of his age.[6]

### A.    Legal Standard Applicable to Age Discrimination Claims[7]

Under the ADEA, an employer is prohibited from discharging an individual or otherwise discriminating against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's age.  29 U.S.C. § 623(a)(1).   A plaintiff can sustain a claim of discrimination under the ADEA by presenting either direct or circumstantial evidence of discrimination.  See Duffy v. Magic Paper Grp., Inc., 265 F.3d 163, 167 (3d Cir. 2001).  A plaintiff faces a "high hurdle" in asserting a direct evidence case.  Mitchell, et al. v. MG Indus., Inc., et al., 822 F. Supp. 2d 490, 501 (E.D. Pa. 2011) (citation omitted).  "Direct evidence of discrimination would be evidence which, if believed, would prove

---

[6] In his complaint, Shade also makes the claim that Defendant failed to offer him a severance package because of his age.  (Doc. No. 1 at ¶¶ 27, 34.)  However, Shade failed to discuss this claim in his brief in opposition to Defendant's motion for summary judgment, and did not attempt to rebut Defendant's articulated, nondiscriminatory reason for its failure to offer Shade a severance package – namely, that Defendant's policy does not permit the offer of severance when an employee is terminated for unsatisfactory work performance.  Accordingly, Shade has failed to demonstrate a genuine issue of material fact as to an age discrimination claim based on Defendant's failure to offer a severance package.

[7] There is no need to differentiate between Shade's federal discrimination claim and PHRA claim because the same analysis is applicable to each.  See, e.g., Simpson v. Kay Jewelers, 142 F.3d 639, 643-44 & n. 4 (3d Cir. 1998); Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999); Fairfield Twp. Vol. Fire Co. No. 1 v. Commonwealth., 609 A.2d 804, 805 (Pa. 1992).

the existence of the fact [in issue] without inference or presumption." Torre v. Casio, Inc., 42 F.3d 825, 829 (3d Cir. 1994) (quotation omitted).

Without evidence of direct discrimination, the Court's inquiry is governed by the three-part framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). See Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009) (reaffirming the use of the McDonnell Douglas framework in ADEA cases involving indirect evidence).

Under the McDonnell Douglas burden-shifting framework, a plaintiff bears the initial burden of establishing a prima facie case of discrimination. Keller v. Orix Credit All., Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1997)). Satisfying the prima facie case of age discrimination creates an "inference of unlawful discrimination." Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 357 (3d Cir. 1999) (quoting Waldron v. SL Indus., Inc., 56 F.3d 491, 494 (3d Cir. 1995)). The elements of a prima facie case of discrimination are as follows: (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive. Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013). The Third Circuit has indicated that the prima facie case is not "intended to be rigid, mechanized, or ritualistic." Pivirotto, 191 F.3d at 352 (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)). Where the plaintiff is not directly replaced, the fourth element is satisfied if the plaintiff can provide facts which "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Id.

Once a plaintiff establishes a prima facie case creating an inference of discrimination, the

16

burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason for the adverse employment action." Jones, 198 F.3d at 412 (citing Keller, 130 F.3d at 1108). The second step of the McDonnell Douglas framework does not require that the employer prove that the articulated legitimate, nondiscriminatory reason was the actual reason for the adverse employment action. Rather, the employer must provide evidence that will allow the factfinder to determine that the decision was made for nondiscriminatory reasons. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

If the employer satisfies this second prong, the burden shifts back again to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual. Burton, 707 F.3d at 726-27. To survive summary judgment when an employer has articulated a legitimate, nondiscriminatory reason for its action, a plaintiff must

> point to some evidence, direct or circumstantial, from which a factfinder
> could reasonably either (1) disbelieve the employer's articulated reasons;
> or (2) believe that an invidious discriminatory reason was more likely
> than not a motivating or determinative cause of the employer's action.

Simpson, 142 F.3d at 644 (citing Fuentes, 32 F.3d at 764).

With regard to the first way a plaintiff can establish pretext, in order to sufficiently establish a basis for disbelief, the evidence must indicate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons. Fuentes, 32 F.3d at 759. Alternatively, the second way a plaintiff can establish pretext is to point to evidence that would allow a factfinder to believe that an invidious discriminatory reason was "more likely than not a motivating or determinative cause" of the employer's action.

Id. at 764.  Specifically, the plaintiff can show pretext this way by presenting evidence "with sufficient probative force" so as to allow the factfinder to "conclude by a preponderance of the evidence that age was a motivating or determinative factor."  Simpson, 142 F.3d at 644-45 (citing Keller, 130 F.3d at 1111).  More specifically, to prove pretext in this context, a plaintiff must point to evidence demonstrating that (1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably.  Simpson, 142 F.3d at 645 (citing Fuentes, 32 F.3d at 765).

**B.      Plaintiff's Age Discrimination Claims**

Defendant argues that it is entitled to summary judgment on Shade's claims that he was terminated from his position on the basis of his age because he has not produced any direct evidence, let alone circumstantial evidence, of discriminatory discharge.  (Doc. No. 25 at 6-10.)  Specifically, Defendant argues that Shade cannot establish a circumstantial case of discriminatory discharge under the McDonnell-Douglas burden-shifting framework because (1) he has failed to make out a prima facie case of age discrimination, and (2) even if he can establish a prima facie case of age discrimination, he cannot point to sufficient evidence demonstrating that Defendant's proffered legitimate, nondiscriminatory reason for its decision to terminate Shade was pretextual.  (Id. at 13-20.)

In response, Shade argues that he has adduced direct evidence of discrimination sufficient to pose a genuine issue of material fact for a jury.  (Doc. No. 31 at 7-12.)  He alternatively argues that under the burden-shifting framework applicable to circumstantial evidence of discrimination, he has produced evidence sufficient to meet the requirements of a

prima facie case of age discrimination, and moreover, he can point to sufficient evidence

demonstrating that Defendant's proffered legitimate, nondiscriminatory reason for its

termination decision was pretext for discrimination.  (Id. at 12-29.)  The Court first addresses

whether the evidence adduced by Shade constitutes direct evidence of discrimination.

### 1.        Direct Evidence of Discrimination

In support of his argument that he has adduced direct evidence of age discrimination,

Shade points to his receipt of two letters from Defendant regarding his retiree medical benefits,

coupled with alleged age-based discriminatory remarks.  (Id. at 10-12.)  The Court first

addresses the letters regarding retiree medical benefits.

The letters referenced by Shade were received by him in May of 2010 and March of

2011, and each indicated that Shade had attained the age of 55 with more than 10 years of

service to Defendant as of September 1, 2009, and thus, he was grandfathered into the

Defendant's retiree medical plan.  (Doc. Nos. 31-4 at 2, 31-5 at 2.)  The letters and attached

statement of Shade's retiree medical benefits represent that for each year of continued service to

Defendant, Shade would receive an additional 2 % annual subsidy from Defendant toward his

retiree medical benefits.  (Doc. No. 31-5 at 2.)  Accordingly, Shade maintains that the longer he

was employed by Defendant, the more expensive Defendant's obligation to him became, and that

Shade's increasingly higher "cost" to Defendant motivated its decision to terminate his

employment.  (Doc. No. 31 at 6.)  Defendant argues that, even assuming that Shade's

termination was somehow motivated by the increasing cost to Defendant of Shade's retiree

medical benefits (a fact it denies), that fact does not support a prima facie case of termination

"because of" his age.  (Doc. No. 36 at 7.)  The Court agrees.

In <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604 (1993), the Supreme Court found that "an employee's age is analytically distinct from his years of service." <u>Id.</u> at 611.  Accordingly, the Court held that termination based on a factor related to length of service does not violate the ADEA because it is not necessarily "age-based."  <u>Id.</u>  As Defendant argues, even assuming that Defendant's termination of Shade was motivated by a desire to reduce costs related to his retiree medical benefits, under <u>Hazen Paper</u>, termination for that reason does not constitute age discrimination.  <u>See</u> <u>Bernhard v. Nexstar Broadcasting Grp., Inc.</u>, 148 F. App'x 582, 585 (3d Cir. 2005) (finding that a "high salary" is analytically distinct from age, and therefore, a termination on that basis is not necessarily age-based);  <u>Broaddus v. Florida Power Corp.</u>, 145 F.3d 1283, 1287 (11th Cir. 1998) ("The ADEA does not prohibit an employer from making an employment decision on the basis of higher salaries, increased benefits, pension status, or claims for medical expenses even though these characteristics are often correlated with an employee's age.").  Accordingly, Shade's receipt of the two letters regarding retiree medical benefits and their increasingly high cost does not constitute "direct evidence," or indeed, any evidence, of age discrimination.

The other "direct evidence" of discrimination that Shade references are age-based discriminatory remarks made to him by his supervisor Ritzman.  Specifically, Plaintiff testified in his deposition that Ritzman stated that he was "too old to cut the mustard" on several occasions.  (Doc. No. 31-1, Exhibit A to Plaintiff's Brief in Opposition at 12-14.) Defendant argues that, even assuming that Ritzman made the remarks as alleged by Shade (a fact Defendant denies), such remarks are insufficient to meet the "high hurdle in making out a direct evidence case."  <u>Mitchell v. MG Indus., Inc.</u>, 822 F. Supp. 2d 490, 501 (E.D. Pa. 2011).  The Court agrees.

As Defendant correctly notes, the Third Circuit has stated that "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight" in determining if unlawful discrimination has occurred.  Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.3d 509, 545 (3d Cir. 1992).  In evaluating whether stray remarks are probative of discrimination, the Third Circuit considers three factors: "(1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and context of the statement." Parker v. Verizon, Pa, Inc., 309 F. App'x 551, 559 (3d Cir. 2009) (citation omitted).  Courts give particular consideration to the third factor, which considers the purpose and context of the statement.  Id. at 559 ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.") (citation omitted).

Defendant argues that the alleged remarks made by Ritzman are too attenuated from Shade's termination to show "that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision," Mitchell, 822 F. Supp. 2d at 501, as required for those remarks to provide direct evidence of discrimination.  As Defendant notes, its decision to terminate Shade was initiated by Human Resources Vice President Amy Hartley, after Shade's performance appraisals indicated that he was not meeting expectations for two years in a row. (Doc. No. 24 ¶¶ 82-84.)  Further, Shade admitted in his deposition that he had "[n]o idea" when the alleged comments occurred or "what the context was," as he did not remember "[d]ates,

times, discussions." (Doc. No. 31-1, Exhibit A to Plaintiff's Brief in Opposition at 13.)[8]

The Court finds that such "stray remarks" fail to indicate that "the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision" sufficient to constitute direct evidence of discrimination, for two reasons. Mitchell, 822 F. Supp. 2d at 501. First, the alleged "stray remarks" were made by someone other than the person who initiated Shade's termination. Second, Shade cannot say with any certainty when the remarks were made, or in what context they were made. Therefore, as Shade has failed to proffer direct evidence of discrimination, the Court analyzes Shade's age discrimination claim under the familiar McDonnell Douglas three-part burden shifting framework. See Smith, 589 F.3d at 692 (reaffirming use of McDonnell Douglas framework in ADEA cases involving indirect evidence).

### 2.     Circumstantial Evidence of Discrimination

As discussed in detail above, a plaintiff bears the initial burden of establishing a prima facie case of discrimination. Keller v. Orix Credit All., Inc., 130 F.3d 1101, 1108 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S.502 (1997)). To allege a prima facie case of age discrimination, a plaintff must show the following: (1) that he is at least forty years old; (2) that he suffered an adverse employment decision; (3) that he was qualified for the position in question; and (4) that he was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive. Burton v. Teleflex Inc.,707

---

[8] At his deposition, when Shade testified that "I know for sure Jim [Ritzman] had told me one time, you know, you're getting too old to cut the mustard," id. at 12, he was asked when the incident occurred, and in response, he stated "I couldn't tell you, I have no – I mean a couple weeks before I was fired. It happened a couple months before I was fired." Id. at 12-13. Later, when asked how many times he alleged Ritzman made the comment, he stated "[t]wo, three times. And I know the one for a fact was it couldn't have been more than days before he calls me up and says, hey you're out of here." Id. at 14.

F.3d 417, 426 (3d Cir. 2013).  Establishing a <u>prima facie</u> case of discrimination creates an inference of unlawful discrimination, and the burden shifts to an employer to articulate a "legitimate, nondiscriminatory reason for the adverse employment action." <u>Jones</u>, 198 F.3d at 412 (citing <u>Keller</u>, 130 F.3d at 1108).  If an employer satisfies this requirement, the burden again shifts to the plaintiff to show, by a preponderance of the evidence, that the employer's legitimate, nondiscriminatory reason was pretextual.  <u>Burton</u>, 707 F.3d at 726-27.

While the parties do not dispute that Shade has sufficiently met the first, second, and fourth prongs of a <u>prima facie</u> case of discrimination, Defendant argues that Shade cannot adduce evidence sufficient to meet the third prong – that he was qualified for the position in question.  (Doc. No. 25 at 18-20.)  Defendant points out that starting in 2008, Shade's annual performance appraisals indicated that he failed to meet expectations in several important areas of his work performance.  (<u>Id.</u> at 19.)  Further, Defendant argues that despite written and verbal feedback regarding these areas needing improvement, Shade's work performance worsened instead of improved, resulting in his termination.  (<u>Id.</u>)  In response, Shade argues that the fact of his qualification for the position of maintenance technician is demonstrated by his employment in that position for approximately nine years, and the fact that he received three merit-based raises during his employment as maintenance technician.  (Doc. No. 31 at 19-20.)  Shade also points to those parts of his performance appraisals from 2003 through 2010 indicating that he met expectations in various areas.  (<u>Id.</u> at 20.)

The Court declines to resolve this issue, because even assuming that Shade demonstrated a <u>prima facie</u> case of age discrimination, he has failed to produce sufficient evidence rebutting Defendant's legitimate, nondiscriminatory articulated reasons for terminating him – namely, that

Shade was terminated due to his failure to meet performance expectations despite prior written and verbal feedback, as well as incidents of insubordination and conflict with another employee.

As noted above, for Shade's claims to survive summary judgment when an employer has articulated a legitimate, nondiscriminatory reason for its action, the burden shifts to Shade to demonstrate pretext by

> point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Tomasso v. Boeing Corp., 445 F.3d 702, 706-07 (3d Cir. 2006) (citations and quotation marks omitted). Shade points to several pieces of evidence that he maintains are sufficient for a factfinder to reasonably either disbelieve Defendant's articulated reason for termination, or believe that a discriminatory reason was more likely than not a motivating or determinative cause of Defendant's action.  The Court addresses each in turn.

First, Shade argues that Defendant's reliance on his disciplinary record to support his termination is pretextual.  (Doc. No. 31 at 21-22.)  Shade maintains that he was the subject of only two instances of discipline while employed by Defendant as a maintenance technician, the first a verbal warning, memorialized in an email dated April 15, 2010, and the second, a written warning, on July 14, 2011.  (Id.)  Shade's argument appears to be that, given that the second instance of discipline occurred eight months prior to his termination, these disciplinary incidents are too remote in time to have any causal relation to his termination;  therefore, Defendant's reference to them as support for its termination decision must be pretextual.  (Id.)  Shade's argument is unavailing.  Defendant's articulated reason for terminating Shade in early 2012 was his worsening job performance, as evidenced by his ratings on performance appraisals completed

in early 2011 and 2012, as well as the disciplinary incidents occurring near the end of his career

with Defendant.  (Doc. No. 24 ¶¶ 83-84.)

    Next, Shade argues that the fact that Defendant retained him for several years prior to

termination, despite identifying areas of his performance requiring improvement, establishes

pretext. (Doc. No. 31 at 22-25.)  Shade points out that since Defendant implemented a new form

of performance appraisal in 2009, his numerical ratings on the categories assessed averaged 2.8

in 2009 and 2010, and dropped to 2.6 in 2011.  (Id. at 23-24.)  From this, Shade argues that the

fact that Defendant had accepted for several years that Shade's performance needed

improvement, and tolerated his level of performance during that time, supports a finding that

Defendant's ultimate decision to terminate Shade's employment for poor performance was

pretextual.  (Id. at 24-25.)  Related to this argument, Shade similarly maintains that Defendant's

employment of him for three years after he received a below average score in six of ten

categories on the 2009 maintenance skills evaluation further establishes pretext, relying on

Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326 (3d Cir. 1995).  (Id. at 25-26.)

    However, as Defendant points out, Brewer is distinguishable from the facts here.  In

Brewer, the employer had tolerated known performance deficiencies for 23 years before

terminating the plaintiff allegedly on the basis of those behaviors. Brewer, 72 F.3d at 332.

Further, in Brewer, the plaintiff had consistently been a top salesperson throughout his

employment, despite the deficiencies that his employer maintained prompted his termination.  Id.

That is a very different situation from the facts here, where Defendant "tolerated" Shade's

increasingly unsatisfactory performance for a period of approximately three years, from 2008-

2011, while giving Shade verbal and written feedback and the reasonable opportunity to improve

his performance.  Accordingly, <u>Brewer</u> has little applicability to the facts of this case.  <u>See</u>

<u>Cridland v. Kmart Corp.</u>, 929 F. Supp. 2d 377, 387 (E.D. Pa. 2013) (finding <u>Brewer</u> inapposite

where the plaintiff failed to present evidence of acceptable performance); <u>McDonnaugh v. Teva</u>

<u>Specialty Pharm., LLC</u>, No. 09-5566, 2011 WL 3862196, at *8 (E.D. Pa. Sept. 1, 2011), <u>aff'd</u>

<u>sub</u> <u>nom.</u> <u>McDonnaugh v. Teva Specialty Pharm.</u>, 489 F. App'x 550 (3d Cir. 2012) (holding that

plaintiff failed to demonstrate pretext where he was informed of the need to improve his

performance, and was terminated when he failed to demonstrate improvement).

Shade next argues that despite his performance deficiencies existing since at least 2008,

Defendant not only tolerated Shade's performance, it rewarded him with merit-based raises in

2008 and 2009, one occurring one month after the maintenance skills review, demonstrating

pretext.  (Doc. No. 31 at 27.)  In response, Defendant points out that the merit-based raises

received by Shade in 2008 and 2009 occurred well before Shade's overall performance fell

below Defendant's expectations in 2011.  (Doc. No. 36 at 18.)  The Court agrees with Defendant.

The fact that Shade last received a salary increase nearly three years before Defendant

terminated his employment for his worsening job performance and failure to improve does not

constitute evidence upon which a reasonable factfinder could base a finding of pretext

Similarly, Shade argues that a letter he received from Defendant in August of 2009

congratulating him on 20 years of service to Defendant, despite Shade's identified performance

deficiencies, establishes pretext.  Once again, this evidence is not indicative of pretext.  As with

the merit-based raises, the fact that Shade received a letter congratulating him on 20 years of

service <u>two and a half years</u> before Defendant terminated his employment for worsening job

performance and failure to improve does not constitute evidence upon which a reasonable

factfinder could base a finding of pretext.

Shade further argues that the fact that Defendant did not inform him of its decision to terminate his employment until two weeks after the decision was made, and allowed him to work during that two week interim period, despite his poor performance and Ritzman's hesitation to give him work because "I don't know what I will get," <u>see</u> (Doc. No. 31-2, Ritzman Dep. at 43-44), indicates that Defendant's stated reason for Shade's termination is pretextual.   (Doc. No. 31 at 28-29.)  Plaintiff fails to cite any legal support for this argument, and the Court is unpersuaded that a two-week delay between the decision to terminate and the meeting informing Plaintiff of that decision constitutes evidence upon which a reasonable factfinder could base a finding of pretext.

The last piece of evidence Shade points to in rebuttal of Defendant's articulated reason for his termination is the alleged remarks made by Ritzman that Shade was "too old to cut the mustard." (Doc. No. 31 at 31.)   As noted above, in determining whether "stray remarks" are probative of discrimination, the Third Circuit considers three factors: "(1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and context of the statement," with a particular focus on (3), the purpose and context of the statement.  <u>Parker</u>, 309 F. App'x at 559.

With regard to the remarks allegedly made by Ritzman, Shade  testified at his deposition that "I know for sure [Ritzman] had told me one time, you know, you're getting too old to cut the mustard." (Doc. No. 31-1, Exhibit A to Plaintiff's Brief in Opposition at 12.)    When asked when the incident occurred, Shade stated "I couldn't tell you, I have no – I mean a couple weeks

before I was fired.  It happened a couple months before I was fired." (<u>Id.</u> at 12-13.)  Later, when asked how many times Ritzman made the comment, he stated "[t]wo, three, times.  And I know the one for a fact was it couldn't have been more than days before he calls me up and says, hey you're out of here." (<u>Id.</u> at 14.)  However, Shade admitted at his deposition that he had "[n]o idea" when the alleged comments occurred or "what the context was," as he did not remember "[d]ates, times, discussions." (<u>Id.</u> at 13.)

As discussed above, Human Resource Vice President Hartley initiated Shade's termination, not Ritzman, but she did so on the basis of performance ratings that were given by him.  Plaintiff apparently seeks to cast doubt on the legitimacy of performance ratings given by Ritzman, which formed the basis of Shade's termination.  However, as Defendant points out, the record shows that, at least as to his 2008-2011 performance appraisals, Shade acknowledges that the feedback he received as part of those appraisals reflected Ritzman's opinion regarding his work performance. (Doc. Nos. 24, 30 at ¶¶ 33, 38, 50, 62.)[9]  Given Shade's admission that his 2008, 2009, 2010, and 2011 performance appraisals reflected Ritzman's view of his worsening job performance, and further, given Shade's inability to say with certainty when the remark(s) were made, or in what context, such "stray remark" evidence fails to carry "sufficient probative force" so as to allow a factfinder to "conclude by a preponderance of the evidence that age was a motivating or determinative factor." <u>Simpson</u>, 142 F.3d at 644-45 (citing <u>Keller</u>, 130 F.3d at 1111).  This is especially so given that the Court has found no other evidentiary basis supporting a finding of pretext.  Ritzman's stray remark(s), standing alone, fails to create a genuine issue of

---

[9] Shade did not receive and review his 2012 performance appraisal prior to his termination.  (Doc. No. 24 ¶ 87.)

material fact as to the pretextual nature of Defendant's articulated reason for Shade's termination.  See Jackson v. Cal-Western Packaging Corp., 602 F.3d 374, 380 (5th Cir. 2010) (stray remarks, "standing alone, are insufficient to defeat summary judgment"); Palasota v. Haggar Clothing Co., 342 F.3d 569, 577 (5th Cir. 2003) (stray remarks are probative of discriminatory intent "so long as remarks are not the only evidence of pretext").  Furthermore, the record contains substantial evidence supporting Defendant's legitimate justification for Plaintiff's termination.  See Auguster v. Vermilion Parish Sch. Bd., 249 F.3d 400, 404 (5th Cir. 2001) (alongside "overwhelming evidence" supporting employer's legitimate reason for termination, stray remarks "are insufficient to survive summary judgment").

Accordingly, as Shade has failed to point to evidence in the record from which a jury could reasonably either disbelieve Defendant's articulated reason for terminating his employment, or believe that some invidious discriminatory reason was more likely than not a motivating or determinative cause of Defendant's action, Shade has failed to create a genuine issue of material fact with respect to his age discrimination claims, and therefore, Defendant's motion for summary judgment will be granted.

## IV.    CONCLUSION

For all of the reasons discussed above, the Court will grant Defendant's motion for summary judgment.  An order consistent with this memorandum follows.